IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 CASE |
| | ) | No. 02-21669 |
| DURANGO GEORGIA PAPER | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Debtor. | ) | |

**ORDER AND OPINION DENYING APPLICATION
FOR ALLOWANCE OF A CLAIM FOR ADMINISTRATIVE EXPENSES**

Presently before the Court is Worldwide Group LLC's ("Movant") Application for Allowance of a Claim for Administrative Expenses (ECF No. 2766) (the "Application") pursuant to 11 U.S.C. § 503(b)(1)(A)(i). Debtor is the owner of the former Durango paper mill site located in St. Marys, Georgia (the "Property"). (Id. at 1; ECF No. 2803 at 3.) In 2014, Movant and creditor ASM Capital, L.P. ("ASM") contracted for Movant to provide certain consulting services related to the potential redevelopment of the Property. (Id.; ECF No. 2811-1 at 1.) Movant subsequently performed a variety of services from 2014 to 2017 in furtherance of its agreement with ASM. (ECF No. 2766 at 1.) On March 13, 2020, Movant filed the at-issue Application, arguing that the services it provided increased "the value and marketability" of the Property. (Id.) Based on these alleged benefits, Movant contends it is entitled to administrative expenses from Debtor's bankruptcy estate (the

"Estate") in the amount of $405,000.00. (Id.) Debtor and ASM oppose Movant's Application (ECF Nos. 2803 and 2804, respectively), as does the Pension Benefit Guaranty Corporation ("PBGC"). The parties presented their arguments and evidence to the Court during the two-day hearing (collectively, the "Hearing"). For the reasons set forth below, Movant's Application will be **DENIED**.

## RELEVANT BACKGROUND

Debtor filed its chapter 11 case in 2002. As noted above, this proceeding arises out of the potential redevelopment of the Property, a former paper mill site in St. Marys, Georgia. (ECF No. 2803 at 3.) In 2006, the Estate sold the Property to North River, LLC ("North River") which sought to "redevelop the site into a mixed-use residential and commercial" area. (Id.) In 2007, the St. Marys City Council (the "City") approved a rezoning plan for the Property submitted by North River. (Id.) However, North River ultimately did not proceed with its plans and Debtor subsequently reacquired the Property in 2010 through its subsidiary, Old Weed and Ready Plantation, Inc. ("OWR"). (Id.) The Property remained available for sale and ASM, having previously invested in the Property,[1] hired Movant to assist in maximizing ASM's "existing financial interest." (ECF

---

[1] According to the testimony of Michael Newsom, the principal of the liquidating trustee in this case (referred to herein as "Mr. Newsom" or the "Trustee"), ASM holds approximately 17% of the unsecured claims in Debtor's bankruptcy case. (ECF No. 2828 at 186.)

No. 2811-1 at 1.)

On September 2, 2014, Movant[2] and ASM entered into an agreement (ECF No. 2811-1) (the "<u>Agreement</u>") under which Movant would provide ASM with "port development consulting services and port and logistics-related business development services" related to redeveloping the Property into a "working, multi-modal port, a domestic and international logistics hub, and a multi-user, environmentally friendly, industrial park." (<u>Id.</u> at 1.) At some point thereafter, ASM[3] and Movant conceived and decided to move forward with accomplishing a "vision" to redevelop the Property as "The Port of St. Marys Industrial Logistics Center" (the "<u>Redevelopment Plan</u>"). (ECF No. 2828 at 102.) KOGS, an affiliate of ASM, intended to acquire the Property through a subsidiary; however, a different use for the Property was envisioned by the subsidiary such that any sale would require the Property to be rezoned to allow for the uses contemplated under the Redevelopment Plan. (ECF No. 2803 at 3-4; ECF No. 2828 at 241.)

Under the Agreement, ASM would pay Movant an initial retainer of $12,500, a

---

[2] Movant is a consulting firm that provides development advice and consulting services related to real estate development and specializes in repurposing industrial and port-related properties. (<u>See</u> ECF No. 2827 at 21.)
[3] Sometime after 2014, OWR entered into a letter of intent (the "<u>Letter of Intent</u>") for resale of the Property with Knights of the Green Shield, LLC ("<u>KOGS</u>"), an affiliate of ASM. The Letter of Intent gave KOGS the right to bargain exclusively for the purchase of the Property during a three-month option period. The Letter of Intent allowed for the option period to be extended for an additional period of three months, at KOGS's option, with a payment of $60,000.00. The Letter of Intent was amended several times and KOGS paid to extend the deadline multiple times; however, no definitive purchase agreement was reached, and the Letter of Intent was terminated on October 1, 2018. (<u>See</u> ECF No. 2803 at 3-5.)

monthly retainer of $8,500, and reimburse Movant for its travel and expenses. (ECF No. 2811-1 at 1.) Additionally, if certain conditions were satisfied, Movant would be entitled to receive a substantial incentive payment for its efforts under the Agreement.[4] (Id. at 2.) The Agreement was for a term of six months; however, ASM continued to reimburse Movant for its expenses and pay the $8,500 monthly retainer through at least December 2017. (See id. at 3; ECF No. 2766 at 4.) In total, ASM paid Movant $335,000 in fees under the Agreement for services rendered during the period of September 2014 through December 2017.[5] (ECF No. 2766 at 4.)

Between 2014 and 2017, Movant's president and sole member, Christopher T. Ragucci, performed a variety of services related to the Property pursuant to the Agreement. (Id. at 1.) According to Movant, these services included "development services, analysis, marketing services, site and engineering reviews, and rezoning-related services" that benefitted the Estate. (Id.) With its Application, Movant submitted "Exhibit A," which includes a one-paragraph summary generally describing the services Movant asserts Mr. Ragucci performed from September 2014 through December 2017. (Id. at 4.) The summary does not include specific dates, parties, or the amount of time that Mr.

---

[4] If certain prerequisites had been satisfied pursuant to the incentive payment clauses of the Agreement, Movant would receive 33% of the equity in a new entity formed to purchase the Property and Movant would be lead project manager and developer of the Property. (ECF No. 2827 at 25.)
[5] The Court notes that ASM paid Movant its retainer fee in March and April of 2018 and a partial monthly retainer in September 2018. In total, ASM paid Movant fees in the amount of $359,000. (ECF No. 2820 at 15.)

4

Ragucci expended on any specific task. (Id.) While the summary does not delineate between services rendered to ASM and those benefitting the Estate, Movant does subtract the amount it was paid by ASM for the time period in question from the total number of hours allegedly worked by Movant. (Id.) Movant further asserts that Debtor should pay Movant $405,000 as an administrative claim for "uncompensated professional time expended for the benefit of the Estate." (Id.) Below is a summary of the figures Movant provided as the basis of its alleged administrative claim:

```
   1,850      Total hours spent during 9/2014 – 12/2017
  x $400      Movant's hourly rate
 $740,000
(- $335,000)  Amount paid by ASM for services rendered 9/2014 – 12/2017
  $405,000    Amount of alleged administrative claim
```

(See id.)

In its Application, Movant asserted that it provided professional services "for the benefit of Debtors [sic] as procured by ASM." (Id. at 1.) However, at the Hearing, Movant also asserted that the services provided by Movant were beyond the scope of the Agreement with ASM and done with the Trustee's knowledge.[6] (See ECF No. 2827 at 10;

---

[6] At the Hearing, Movant also attempted to argue that it should be compensated for services rendered to the Estate after December 2017. (See ECF No. 2828 at 77.) However, the Application failed to include any description of services rendered after December 2017 and Movant failed to produce any evidence to suggest that Movant was ever retained by the Estate or that services were ever rendered to the Estate after December 2017. Rather, evidence was presented to suggest that Movant was still working on behalf of ASM after December 2017. ASM introduced a spreadsheet prepared by Mr. Ragucci that indicated Movant was paid its full retainer in March and April of 2018 and partial retainer in September of 2018. (See ECF No. 2820 at

5

ECF No. 2828 at 328.) At the Hearing, Movant highlighted three overarching tasks to illustrate that its services conferred benefits to the Estate: (1) the updated wetlands survey and delineation; (2) the creation of a tax allocation district; and (3) the rezoning of the Property.[7]

First, Movant stressed that Mr. Ragucci worked to coordinate the procurement of an updated wetland survey and a new jurisdictional determination[8] (the "Wetland Permit") from the U.S. Army Corps of Engineers (the "Corps"). Mr. Ragucci testified that the Wetland Permit "is a critical basic document for any purchaser" because it defines

---

15; ECF No. 2828 at 122.) Further, Movant introduced emails from March 2018 that indicate Movant was still working with ASM. (ECF No. 2815.)

[7] The Court notes that some testimony suggested Movant provided services during the relevant 2014–2017 time period in addition to these three tasks. In particular, Mr. Newsom and Mr. Ragucci testified about a potential marina development involving the Camden County Joint Development Authority (the "Camden JDA") and the Barnett Southern Corporation ("Barnett") barge loading lease. (See ECF No. 2828 at 82, 190, 219-23.) With respect to the Camden JDA marina, the testimony indicated that a marina might be built on the Property, and Mr. Ragucci asserted that his work resulted in the Camden JDA expending $400,000 in due diligence and obtaining permits. (Id. at 223.) However, other the Court was not provided with sufficient information or evidence, other than Mr. Ragucci's self-serving testimony, to corroborate Mr. Ragucci's assertions or even be able to determine the details of the deal and/or any implications that such a deal would have on these proceedings. The Barnett lease is discussed in more detail below.

[8] The Clean Water Act ("CWA") prohibits the discharge into navigable waters of any pollutant, including dredged or fill material, unless authorized by a CWA permit. 33 U.S.C. § 1311(a). CWA section 404, 33 U.S.C. § 1344, is the provision which regulates the Corps' issuance of such permits. For the purpose of the CWA, "Adjacent wetlands" are considered "waters of the United States," subject to the jurisdiction of the CWA. 33 C.F.R. § 328.3. Although the CWA defines "Adjacent Wetlands," 33 C.F.R. § 328.3(c), their precise boundaries are often unclear, which requires the Corps to delineate the areas under the jurisdiction of the CWA. Rapanos v. United States, 547 U.S. 715, 724–25 (2006). To this end, the Corps issues "jurisdictional determinations" to determine the applicability of the CWA to activities or tracts of land. If the Corps determines a proposed activity will result in a discharge into a wetland or other water of the United States, said activity requires a permit. 33 U.S.C. § 1344; 33 C.F.R. § 320.1.

which areas of the Property are regulated wetlands and, therefore, "non-buildable," and which areas are nonregulated and, therefore, "buildable." (ECF No. 2828 at 213.) According to Movant, the Estate had an expired wetland survey that did not accurately represent the buildable portion of the Property. Consequently, Mr. Ragucci hired consultants to produce environmental reports[9] and coordinated with Mr. Newsom on the preparation of a new wetland survey (the "Survey"),[10] which revealed that the Property's buildable acreage had decreased from approximately 550 acres to 425 acres. (ECF No. 2827 at 48.) Mr. Ragucci then recruited an environmental consulting firm to verify this conclusion with the applicable regulatory agencies. (Id.) On February 22, 2016, the Corps issued the Wetland Permit, which confirmed the Survey's assessment. (ECF No. 2822.) The Wetland Permit was scheduled to expire on February 22, 2021. (Id.) Mr. Ragucci testified at length about the many ways the Survey and the Wetland Permit benefitted the Estate. In particular, he testified that in his opinion:

> This is a critical basic document for any purchaser. Any bank would require it at closing, and they would require a currently valid delineation. And it just happens that these delineations are valid for 5 years. . . . So this is a very important fact, and it is a very significant document as part of any

---

[9] The Court notes that the environmental reports were prepared for KOGS c/o Movant. (ECF No. 2811-8 at 84.)

[10] Mr. Newsom testified that in his experience the seller of real property does not pay for a wetland survey; rather, the potential buyer bears such cost. Mr. Newsom testified that ASM/KOGS wanted the Survey in order to update the Wetland Permit, but they would not pay for it. As a result, the Estate paid for the Survey because Mr. Newsom thought its completion was the only impediment to closing the sale with KOGS. (ECF No. 2828 at 141-44, 200.)

7

>   new purchaser's due diligence, and there would be no purchaser in their right mind that would ever close on a site like this, without such a document. It's just a basic requirement of today's practice.

(ECF No. 2828 at 213.)

Next, Movant argued that its services resulted in the City's creation of a tax allocation district[11] (the "TAD") and the issuance of TAD bonds in support of the redevelopment of the Property. At the Hearing, Mr. Ragucci testified that the Property required substantial improvements to external infrastructure to be transactable, and that the City did not have the funds to make those improvements. (ECF No. 2828 at 217-18.) As a solution, Mr. Ragucci testified that he proposed creating a TAD comprised of the Property and its surrounding areas. (Id.) Mr. Ragucci also testified that he recruited a consulting firm and met with City officials to present a plan for the TAD, resulting in the City's approval in December 2015. (Id. at 219.) Although the TAD is currently in place, it has not been funded because, as Mr. Ragucci explained, "you can't trigger the bonding process and actually fund the TAD until such time as there's revenue stream to backstop the bond because they're going to be carrying interest, and there's also closing expenses."

---

[11] A tax allocation district is a redevelopment and financing tool by which governments can provide financial assistance to eligible private redevelopment efforts within an officially designated area. O.C.G.A. § 36-44-1, et seq.; see generally Sherman v. Atlanta Indep. Sch. Sys., 744 S.E.2d 26, 27–29 (Ga. 2013) (discussing the history of TAD financing in Georgia). Creating a TAD freezes the assessed value of real property within the TAD, and for up to the next 30 years, any additional annual property taxes generated as a result of rising property values are diverted to a special fund to pay for redevelopment costs. Id. This future stream of revenue can then be pledged as security for the issuance of bonds to provide up-front and ongoing capital for infrastructure and improvements within the TAD, and to spur investment. Id.

(Id. at 219-20.) He also explained that "having the TAD in place assures this purchaser or any other purchaser that he will have the ability to use tax increment financing under this TAD to allow bonds to be issued to help fund the infrastructure external of the site that's required to be built." (Id. at 220.)

Finally, Movant asserted that it successfully worked to rezone the Property. The Property was previously zoned for "PD-Mixed Use." (ECF No. 2811-5 at 19.) However, the Redevelopment Plan required changing the Property's zoning designation to allow for industrial and commercial uses. (ECF No. 2828 at 240.) Mr. Ragucci testified that he was involved in "coordinating and managing the consultants" who participated in the rezoning process, and in "pursuing that process on behalf of the [E]state." (Id. at 27.) On November 3, 2015, Movant submitted a rezoning application and development plans to the St. Marys Planning Commission, which issued a recommendation to approve the rezoning on March 14, 2016. (ECF No. 2811-5 at 19.) On May 9, 2016, the City approved the rezoning resolution, changing the Property from PD-Mixed Use to "PD-Port Industrial, PD-Mixed Use and PD-Conservation Area" (the "Zoning Ordinance"). (Id.) In March 2020, at OWR's request, the City approved amendments to the Zoning Ordinance, extending the mixed-use zoning area and allowing multi-family housing on the Property.[12]

---

[12] OWR and the Trustee have entered into another asset purchase agreement with another potential buyer that proposes a different development plan for the Property and are currently pursuing rezoning of parts of the Property. (ECF No. 2803 at 6.)

9

(ECF No. 2823 at 6.) Mr. Ragucci testified that in his opinion the Zoning Ordinance conveyed a benefit to the Estate because any future use changes will require only an amendment to the Zoning Ordinance, which is a much easier and less time-consuming process. (ECF No. 2828 at 240-41.) Mr. Ragucci repeatedly asserted that any potential purchaser will rely on and use the Zoning Ordinance that Movant facilitated and that such use is a benefit to the Estate. (See id. at 225-28, 244-45.) However, when asked more about this, Mr. Ragucci admitted that any potential buyer would "have no choice" but to rely on the existing Zoning Ordinance because it governs the Property. (Id. at 245.)

The Trustee, ASM, and PBGC, on the other hand, oppose the Application. The Trustee argues that Movant's request for an administrative claim under Section 503(b) should fail for a number of reasons. First, the Trustee argues that Movant did not allege any transaction with Debtor nor was Movant ever retained as a professional to render services for Debtor or promised any payment by the Trustee; rather, Movant's services were merely due diligence rendered pursuant to the Agreement for the benefit of ASM. The Trustee also argues that there is no evidence that suggests Movant's services conveyed any concrete benefit to the Estate. Further, the Trustee asserts that Movant's alleged services were not actual or necessary to preserve the Estate. Finally, the Trustee argues that Movant was not approved by the Court to be employed as a professional under 11

10

U.S.C. § 327(a),[13] and Movant should be not awarded compensation under 11 U.S.C. § 503(b)(1)(A). (ECF No. 2803.) ASM and PBGC also oppose Movant's Application and endorse the Trustee's position. (ECF No. 2804; ECF No. 2827 at 19.)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In its Application, Movant seeks administrative fees from the Estate pursuant to 11 U.S.C. § 503(b)(1)(A)(i) which allows administrative expenses for "the actual, necessary costs and expenses of preserving the estate including – wages, salaries, and commissions for services rendered after the commandment of the case." Here, Movant requests fees in the amount of $405,000.00, representing the purported value of Mr. Ragucci's services that benefitted the Estate. (See ECF No. 2766.)

**I.   Movant's Claim Fails to Meet the Requirements for Administrative Expenses.**

"[A]dministrative expense claims are strictly construed against the claimant," and a claimant has the burden of proving his entitlement to fees by the preponderance of the

---

[13] The parties disagree as to whether 11 U.S.C. § 327 precludes Movant's recovery of administrative expenses. (ECF No. 2803 at 7; ECF No 2827 at 17.) However, the Court need not address these arguments because Section 327 is inapplicable in the present case. No party has applied for approval of Movant's employment as a professional under Section 327(a) and Fed R. Bankr. P. 2014(a) or put forth sufficient evidence to establish that it is a professional. Further, Movant does not appear to have taken a "pivotal" or "central" role in Debtor's reorganization, which is generally the test for whether a person or entity is a Section 327 professional. In re River Ranch, Inc., 176 B.R. 603, 605 (Bankr. M.D. Fla. 1994) (finding environmental consultant not a professional because it "had not sought to be employed to play a pivotal role in the reorganization process"); Matter of D'Lites of Am., Inc., 108 B.R. 352, 355 (Bankr. N.D. Ga. 1989) ("[A] 'professional person' is one who takes a central role in the administration of the bankruptcy estate and in the bankruptcy proceedings . . ."). Here, there is no evidence that Movant "play[ed] a central or significant role in the overall administration of the Debtor's estate [or] ha[d] any autonomy in [the same];" accordingly, Section 327 does not apply in this case. In re Am. Tissue, Inc., 331 B.R. 169, 174 (Bankr. D. Del. 2005).

11

evidence. In re Brooks, No. 13-10860, 2016 WL 1376354, at *4 (Bankr. S.D. Ga. Mar. 31, 2016); see also Varsity Carpet Servs. v. Richardson (In re Colortex Indus.), 19 F.3d 1371, 1377 (11th Cir. 1994) ("[S]ection 503 priorities should be narrowly construed in order to maximize the value of the estate preserved for the benefit of all creditors."); In re Dayhuff, 185 B.R. 971, 974 (Bankr. N.D. Ga. 1995). Movant "must establish that its claim constitutes an actual and necessary expense of the estate in order for the estate to be bound to pay the claim." In re Am. Plumbing & Mech., Inc., 323 B.R. 442, 458 (Bankr. W.D. Tex. 2005) (alteration in original). To that end, Movant must satisfy a two-part test by showing (1) its expenses arose from a post-petition transaction between it and Debtor, and (2) its expenses were actual and necessary to preserve the Estate. In re Jarriel, 518 B.R. 140, 146 (Bankr. S.D. Ga. 2014). Movant has failed to establish either of these elements.

    A.    <u>Movant Did Not Transact with Debtor.</u>

First, Movant must demonstrate that its claim arose from a post-petition transaction between Movant and Debtor.[14] Id.; In re Garden Ridge Corp., 321 B.R. 669, 676 (Bankr. D.

---

[14] Exceptions to the requirement that an administrative expenses claim must arise from a post-petition transaction between the claimant and the debtor typically arise in "continuing involuntary transaction[s]" where a property is sold in foreclosure and a debtor continues to use and remains in possession of the property. In re Espinosa, 542 B.R. 403, 411 (Bankr. S.D. Tex. 2015) (administrative expense claim of creditor, which had purchased chapter 13 debtor's homestead property at a pre-petition non-judicial tax lien foreclosure sale, for lost opportunity represented by debtor's possession of the homestead, was "a continuing involuntary transaction arising out of [d]ebtor's possession"); see also In re Kuvykin, No. 18-10760 (JLG), 2018 WL 4191854, 2018 Bankr. LEXIS 2634, at *3 (Bankr. S.D.N.Y. Aug. 31, 2018) (claim arose out of "acknowledged post-petition use and occupancy" of foreclosed upon property); In re Bridgeport Nurseries, Inc., 190 B.R. 215, 221 (Bankr. D.N.J. 1996) (bank, as owner of property occupied by the debtor, held an

12

Del. 2005); In re Section 20 Land Grp., Ltd., 261 B.R. 711, 715 (Bankr. M.D. Fla. 2000); In re CP III Ltd. P'ship, 224 B.R. 206, 208 (Bankr. M.D. Fla. 1998).

In the present case, Movant certainly acted post-petition; however, Movant did not transact with Debtor. Rather, Movant seeks administrative expenses for services provided to ASM and its affiliate, pursuant to a contract between Movant and ASM. Based on the evidence presented, the Court concludes that all of the services Movant now seeks to be compensated for were performed on behalf of and/or at the behest of ASM or its affiliate in furtherance of "pursuing the execution" of ASM's vision for the Property as contemplated under the Agreement. (ECF No. 2811-1 at 1.) The description of the services Movant agreed to provide to ASM under the Agreement is broad and encompasses all of the services Movant alleges it rendered for the benefit of the Estate.[15] Movant even states

---

administrative priority expense claim for debtor's post-foreclosure, post-petition use and occupancy of business property; bank and debtor effectively had a landlord-tenant relationship). In those cases, courts have concluded that a transaction satisfying the first element occurred. That is not the case before the Court. Here, there has been no foreclosure, no property is involved, and Debtor has not used or occupied property owned by Movant.

[15] Under the heading "Services," the Agreement provided the following, in pertinent part:

> [Movant's] services shall include but not be limited to reasonable efforts and activities designed to identify and secure the appropriate users, partners and investors necessary to realize a significant financial return to ASM on its present financial interest in the Property. This shall be accomplished by fully developing and articulating ASM's vision for the Property of a working, multi-modal port, a domestic and international logistics hub, and a multi-user, environmentally friendly, industrial part, and actively pursuing the execution of this vision on behalf of ASM.

(Id.) Movant also agreed to provide business development services to ASM, including "without limitation, consulting services, site development and engineering recommendations in conjunction with professional firms retained by ASM for the design and construction of improvements on the [Property]." (Id.) Further,

in its Application that it rendered services "for the benefit of the Debtors [sic] as procured by ASM." (ECF No. 2766 at 1.) Additionally, Movant was already compensated by ASM for the work it performed from September 2014 through December 2017, as evidenced by "Exhibit A" to the Application, which does not distinguish between work performed for the benefit of ASM and work it allegedly rendered on behalf of the Estate.[16] (Id. at 4.)

Most importantly, Mr. Ragucci's own testimony makes it clear that when he rendered the services in question, he was acting as ASM's agent under the Agreement with ASM. When asked about certain provisions of the Agreement, Mr. Ragucci testified, "My job was to find a way to create value for ASM. And the only way to do that is to first create value in the asset that they've invested in, and hopefully some type of transaction comes

---

Movant agreed to "actively engage in dialog [sic] and discussions with the local, state and regional economic development agencies as necessary and required, including without limitation, the Georgia Economic Development Commission, the Camden County Joint Development Agency, the Georgia Ports Authority, the City of St. Marys." (Id.)

[16] Both Mr. Newsom and Mr. Ragucci testified that the Estate received rent from Barnett, a third party (not affiliated with ASM). Sometime after February 2017, Barnett set up a temporary rock barge loading operation and obtained permits to construct and operate such an operation. Mr. Ragucci asserted that he was working on behalf of the Estate in obtaining the Barnett lease and opined that this conferred an actual benefit of $60,000 to the Estate in rent paid to the Estate and also provided evidence to potential purchasers that a commercial barge activity could be operated in the river without any dredging or adjustments to the water. (ECF No. 2828 at 47-50.) Mr. Newsom testified that the monthly rent from the lease with Barnett was $8,000, and that the Estate received $4,000 a month and he believed that either Mr. Ragucci, ASM, or KOGS also received $4,000 monthly. (Id. at 192-93.) Mr. Ragucci denied receiving any amounts under the lease and denied any knowledge as to whether ASM or KOGS received any amounts. (Id. at 82.) While this rental agreement did result in the Estate receiving rental income, Mr. Newsom's testimony indicates that the total rent was split between the Estate and ASM or its affiliate, with the Estate and ASM or its affiliate each receiving $24,000. Because the rent was shared by the Estate and ASM, the Court finds it reasonable to conclude that Mr. Ragucci was not working on behalf of the Estate when Movant secured the Barnett lease. Rather, his efforts were undertaken as ASM's agent under the Agreement.

14

out that produces a liquidation event."[17] (ECF No. 2828 at 73.) It is clear from this testimony that Movant rendered its services on behalf of ASM in accordance with the terms of Movant's Agreement with ASM. Accordingly, Movant has failed to establish that it transacted with Debtor. Therefore, its claim does not qualify for administrative priority and its Application must be denied.

B. There Is No Credible Evidence of Any Actual Benefit to the Estate.

Even if the Court assumes for the sake of argument that Movant had satisfied the first element required to recover under 11 U.S.C. § 503(b), Movant must also demonstrate that the transaction "directly and substantially benefitted the estate." In re Five Star Partners, L.P., 193 B.R. 603, 613 (Bankr. N.D. Ga. 1996) (internal quotations omitted). Services are compensable as administrative expenses only upon a showing that they "actual[ly]" benefited the estate. 11 U.S.C. § 503(b)(1)(A). The "mere potential of benefit" is insufficient. Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 866 (4th Cir. 1994); see also Broadcast Corp. v. Broadfoot, 54 B.R. 606, 611 (Bankr. N.D. Ga. 1985). "[T]hat which is thought to have some potential benefit, in that it makes a business more likely salable, . . . is too speculative to be allowed as an 'actual, necessary cost and expense of preserving the

---

[17] Movant also alleged that it believed that the Trustee would pay it from the Estate. However, the Court finds that there is no credible evidence to support that allegation, particularly because Movant had already been compensated by ASM. The Court finds it reasonable to conclude that Movant's actions were likely motivated by the potential equity incentive payment it would receive under the Agreement if the Property were sold to ASM or its affiliate or an investor was found.

estate.'"  In re Subscription Television of Greater Atlanta, 789 F.2d 1530, 1532 (11th Cir. 1986).

In its Application, Movant contends it is entitled to compensation because Mr. Ragucci's services conferred a benefit upon the Estate by increasing the value and marketability of the Property. (ECF No. 2766 at 1.)  Specifically, Movant maintains that the Property "would not have been as marketable" without Mr. Ragucci's successful rezoning efforts.  (Id.)  Mr. Ragucci reiterated this contention at the Hearing, arguing that the new zoning classifications make the parcel more attractive to potential buyers and that the Estate will benefit from a future sale.  He argued that the updated Survey and Wetland Permit and the TAD saved the Estate and any future buyer necessary due diligence costs and increased the value of the Property.  At the Hearing, Mr. Ragucci testified at length about the many alleged benefits to the Estate that he believes his work created.  In describing said benefits, he opined that the services he provided were "primarily to the benefit of the [E]state because they're moving the [E]state into the direction of having that updated, valid, and complete due diligence package to transact with any potential buyer or investor."  (ECF No. 2827 at 38.)  When asked if the Estate benefitted even if there was no sale to ASM or its affiliate, Mr. Ragucci responded, "Absolutely, because the [E]state needs to transact with somebody.  And if it's not ASM, then it's got to go back on the market with a commercial real estate broker.  And you've got to have these documents."

16

(Id. at 37.) Essentially, Mr. Ragucci argued that his efforts made the Property more likely to "transact" or more marketable to a potential investor or buyer. (Id.) Accordingly, Movant seeks administrative expenses for the hours expended by Mr. Ragucci and uncompensated by ASM.

Based upon the evidence and testimony presented, the Court finds that Movant has failed to establish that its services conferred a benefit as contemplated by Section 503(b). First, Movant's theory of any benefit conveyed to the Estate must fail because, as discussed above, the evidence indicates that Movant rendered the services at issue at ASM's direction, for the benefit of ASM and its affiliate. Further, to the extent there is benefit to the Estate, such is contingent on the Property's *future* sale—a "potential benefit"—a benefit that is, by definition, not concrete. In re Subscription Television of Greater Atlanta, 789 F.2d at 1532. While Mr. Ragucci testified extensively regarding how each of the three overarching tasks he performed were beneficial to the Estate, there was no credible evidence presented to suggest that any materials he procured or produced increased the value of the Estate or actually led to a quantifiable benefit realized by the Estate. Indeed, Mr. Ragucci's own testimony indicates that any benefit would flow to a potential purchaser or investor,[18] as was the case with ASM.

---

[18] Mr. Ragucci testified that in his opinion: (i) the Wetland Permit was a due diligence item that all potential purchasers and investors would require; (ii) that the unfunded TAD would be valuable to a potential purchaser or investor once there was a revenue stream coming from the Property; and (iii) that any other

"Where [a] speculative benefit is not quantifiable, the mere potential benefit does not qualify as a benefit for purposes of determining administrative expense priority status." In re Ideal Mortg. Bankers, Ltd., 539 B.R. 409, 431 (Bankr. E.D.N.Y. 2015); see Ford Motor Credit Co. v. Dobbins, 35 F.3d 860, 866-67 (4th Cir. 1994) (finding that "the mere opportunity to market collateral is [not] the type of concrete, actual benefit contemplated by § 503(b)(1)(A)"); In re IDL Dev., Inc., No. 18-14808-CJP, 2019 Bankr. LEXIS 3419, at *7 (Bankr. D. Mass. Nov. 1, 2019) ("[The] 'purported' value conferred on the Debtor in its sale process . . . . is speculative and does not meet the requirements of § 503(b)(1)(A)."); In re Brooks, No. 13-10860, 2016 WL 1376354, at *6 (Bankr. S.D. Ga. Mar. 31, 2016) (allegation that prior maintenance of property assisted in sale was speculative and not concrete); Park Nat'l Bank v. Univ. Ctr. Hotel, Inc., No. 1:06-cv-00077, 2007 WL 604936, at *6 (N.D. Fla. Feb. 22, 2007) ("It is not enough that the incurring of an expense secured a potential benefit or maintained right to obtain a future benefit for estate, if estate did not actually make beneficial use of the value received in exchange for incurring the expense."). Said differently, the record is devoid of any credible evidence showing the amount by which the Estate benefitted from the purported use of Movant's services, and the Court cannot award administrative expenses where the at-issue benefits are no more than speculative.

---

buyer or investor would have to rely on the Zoning Ordinance because it is the zoning currently in place. However, the Court still finds those "potential benefits" entirely speculative and notes that none of those benefits flow to the Estate.

AO 72A
(Rev. 8/82)

Further, "[c]laimants are not entitled to recovery for taking actions that were calculated to protect their interests, rather than those of an estate and all of its creditors." In re Pugh Shows, Inc., 307 B.R. 50, 57 (Bankr. S.D. Ohio 2004) (internal citations omitted); In re Dayhuff, 185 B.R. 971, 974 (Bankr. N.D. Ga. 1995). Due to its contractual relationship with ASM, Movant had an independent interest in rendering the services included in the Application: to perform in accordance with the Agreement and protect its own interests by avoiding liability to ASM for breach of the Agreement. This personal interest, not a desire to benefit the Estate, motivated Movant's actions.[19]

Ultimately, the Court must deny Movant's request because it has not proffered credible evidence showing to any degree of certainty that Mr. Ragucci's services resulted in a tangible benefit to the Estate. Movant's claims are contingent upon the future sale of the Property, falling squarely into the category of "potential" benefits to the Estate; as such, they do not give rise to an administrative expense claim under 11 U.S.C. § 503(b)(1). Accordingly, the Movant's Application must be denied. Based on the foregoing,

## ORDER

**IT IS HEREBY ORDERED** that Movant's Application for Allowance of a Claim for

---

[19] While Movant may have argued that its claim is based on services it contends exceed the scope of the Agreement with ASM, the fact remains that Movant did not transact with Debtor. Furthermore, because Movant was potentially entitled to an incentive payment under the Agreement if a buyer or investor closed on the Property, it is reasonable to conclude that Movant was not only protecting its own interests but also *promoting* its own interests when it rendered the services for which it now makes an administrative claim.

AO 72A
(Rev. 8/82)

Administrative Expenses (ECF No. 2766) is **DENIED**.

_____
Michele J. Kim
United States Bankruptcy Judge
Southern District of Georgia

Dated at Brunswick, Georgia,
this 31st day of March, 2021.